ISHEE, J.,
 

 for the Court.
 

 ¶ 1. Approximately four years after divorcing, Charles E. Allen III and his ex-wife, Janet Ellen Davis Allen, filed a Joint Application to Revoke Judgment of Divorce. However, Charles died a month later, before any action could be taken on the application. The Chancery Court of Pearl River County conducted a hearing on the application and revoked the couple’s divorce. Arthur D. Carlisle (Carlisle), the administrator of Charles’s estate, timely appealed from that judgment, citing the following issues:
 

 I. Whether the chancellor erred in failing to dismiss the motion to reconsider as untimely.
 

 II. Whether the chancellor had jurisdiction to revoke the final judgment of divorce following Charles’s death.
 

 III. Whether the joint application should have been dismissed because Janet failed to file a revivor after Charles’s death.
 

 
 *1267
 
 TV. Whether it was error to set aside the judgment quashing the joint application and to allow Janet to put on evidence of reconciliation.
 

 V. Whether it was error to allow Janet to put on proof of reconciliation after Charles’s death.
 

 VI. Whether the evidence was sufficient to set aside the divorce of Charles and Janet.
 

 Finding that the chancery court should not have conducted a hearing on the matter of revoking the Allens’ divorce following Charles’s death, we reverse the judgment of the chancery court and render judgment reinstating the divorce decree.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. Charles and Janet married on November 24, 1996, in St. Tammany Parish, Louisiana. They lived together in Pearl River County, Mississippi until their divorce. They filed a joint petition for divorce, and after a trial, a final decree of divorce was entered on September 23, 2002, in the Chancery Court of Pearl River County. The couple had no children during their marriage.
 

 ¶ 3. Almost four years after their divorce, on May 17, 2006, Charles and Janet filed a Joint Application to Revoke Judgment of Divorce with the Chancery Clerk’s Office of Pearl River County. The application was properly signed by both parties. However, prior to any action being taken concerning the joint application, Charles died in his home on June 16, 2006.
 

 ¶ 4. The attorneys for the parties filed their entries of appearance the following month, with Carlisle appearing as the administrator of Charles’s estate. Thereafter, on June 5, 2007, the chancellor entered a judgment quashing the parties’ application to set aside the divorce. The judgment allowed for reconsideration if Janet timely filed a request and showed sufficient facts of a satisfactory reconciliation. The judgment was filed on June 11, 2007, and Janet filed a motion for reconsideration eleven days later on June 22, 2007. Carlisle objected to the motion as being untimely filed. Nevertheless, the chancellor held a hearing on the matter on October 2, 2007.
 

 ¶ 5. Janet testified that Charles never wanted to get a divorce. The reason that Janet divorced Charles was that she had become sick, and her mother encouraged her to get a divorce. According to Janet, Charles did not even come into the courtroom on the day of their divorce. Following their divorce, they maintained their relationship. They continued talking and going out. Janet said that Charles had a private line put in at her house, so he could call her. They even spent weekends together- — every weekend from the end of March 2006 until Charles’s death in June 2006.
 

 ¶ 6. Janet shattered her hip and pelvis shortly after Hurricane Katrina, which required an extended stay in the hospital. She said that she did not get to see Charles during that time period because the roads were all blocked as a result of Hurricane Katrina. After she began her rehabilitation, she said that Charles would call her multiple times a day. When Janet moved back to her home, which happened to be former the marital home, her mother also came to stay with her because her mother’s house had suffered damage during the storm. Janet said that it was hers and Charles’s plan to sell his house and move into the former marital home together after her mother moved back into her own home.
 

 ¶ 7. Janet’s mom — Mary Davis — testified that the coroner sent Charles’s personal effects to her, seemingly because of
 
 *1268
 
 her daughter’s relationship with Charles. She said that Carlisle came to the house and took all of those items, including Charles’s car. He told her that he was supposed to have them.
 

 ¶ 8. Beverly Slaydon cleaned Charles’s house for him until he died. She said that she met Janet while she was working for Charles. Beverly saw Janet whenever Janet came to Charles’s house. Beverly also talked to Janet on the phone, but Charles would not let her call Janet because he said Janet’s phone number was only for him to know. Beverly said that Charles was on the phone with Janet constantly — “probably the whole time [she] was there.... ” The only other woman she ever saw at Charles’s house was Janet’s personal-care provider. According to Beverly, Janet spent weekends at Charles’s house on a regular basis. Beverly said that Charles and Janet would hold hands, talk, and laugh; she thought that they loved each other very much.
 

 ¶ 9. Patricia Beard was Janet’s personal-care provider. She took care of Janet from November 2005 through May 2006 while Janet recovered from a shattered hip and pelvis. She saw Charles about three or four times a week when he would bring Janet lunch, flowers, or presents. Patricia thought that Charles and Janet had a very loving relationship and that they were very affectionate toward each other. She drove Charles and Janet to the courthouse in Poplarville, Mississippi so they could file the papers to revoke their divorce. Patricia said that she saw Charles sign the joint application and take it into the courthouse. She also said that she filed some papers for them. Patricia remembered the two of them spending hours on the phone with each other all the time. They would watch television together while they were on the phone. It was Patricia’s understanding that Charles and Janet were going to revoke the divorce and that Charles was going to move back into the former marital home with Janet. Charles had Patricia find his wedding band, and she saw him wearing it.
 

 ¶ 10. Carlisle testified on behalf of the deceased. Carlisle said that he and Charles had known each other since 1969 and that they were close friends. Carlisle testified that he prepared the application to revoke the divorce. He said that he had previously prepared a number of them for Charles, but Charles had thrown them away. It was Carlisle’s understanding that Charles never intended to actually revoke the divorce. He thought that Charles felt he had been cheated out of the marital home and that he had an ulterior motive to “recover what he thought was rightfully his.” Carlisle said that he visited Charles at least once every two weeks during 2006, and he never noticed any sign of anyone staying with Charles. Upon learning about Charles’s death, Carlisle visited Janet at her home, and he said that the first thing that Janet told him was that she was not paying for the funeral. As a result, he said that he took care of a number of the funeral arrangements.
 

 ¶ 11. Following the testimonies presented by both sides, the chancellor found that jurisdiction was proper and that the criteria required to revoke a divorce had been met. The chancellor found that the filing of the application by both parties initially evidenced their intent to revive their marriage. Supporting that intention, the chancellor noted that Charles and Janet often stayed with each other, went out together, talked frequently, and even opened a joint bank account in their name. The chancellor dismissed the claim that the joint application was an attempt by Charles to trick Janet into allowing him to acquire title to the former marital home. Accordingly, the chancellor entered a judg
 
 *1269
 
 ment revoking the divorce of Charles and Janet. On behalf of the deceased, Carlisle timely appealed from that judgment.
 

 STANDARD OF REVIEW
 

 ¶ 12. Generally, this Court applies an abuse of discretion standard when reviewing the findings of a chancellor. “The chancellor is granted wide discretion in deciding domestic relations matters!,] and we will reverse his decision only when his decision is shown to be manifestly wrong, clearly erroneous, or that he applied an incorrect legal standard.”
 
 Smith v. Smith,
 
 856 So.2d 717, 719(¶ 7) (Miss.Ct.App.2003) (citing
 
 Barton v. Barton,
 
 790 So.2d 169, 175(¶ 17) (Miss.2001)). However, this Court will review questions of law under a de novo standard.
 
 Keener Props., L.L.C. v. Wilson,
 
 912 So.2d 954, 956(¶ 3) (Miss. 2005).
 

 DISCUSSION
 

 ¶ 13. Carlisle argues that the chancellor lacked jurisdiction to revoke Charles and Janet’s divorce because Charles had died. Generally, the court that granted a divorce may revoke the divorce “upon the joint application of the parties, and upon the production of satisfactory evidence of their reconciliation.” Miss.Code Ann. § 93-5-31 (Rev.2004). Carlisle, as administrator of Charles’s estate, cites
 
 Wells v. Roberson,
 
 209 So.2d 919, 922 (Miss.1968) in support of his argument. The supreme court in
 
 Wells
 
 stated “that on the death of the party his interest ceases, and the jurisdiction of the court ceases also.”
 
 Id.
 
 (quoting
 
 Gerault v. Anderson,
 
 1 Miss. 30, 34 (1818)).
 

 ¶ 14.
 
 Wells
 
 is distinguishable from the present ease because only one ex-spouse sought to revoke the divorce. It also involved a pai’ty seeking to overturn a decree of divorce, but the former spouses in
 
 Wells
 
 did not file a joint application to revoke their divorce.
 
 Id.
 
 at 920. The couple was granted a divorce in an order filed on December 16, 1966.
 
 Id,
 
 The ex-husband then passed away less than two weeks later, on December 27.
 
 Id.
 
 Subsequently, the deceased’s ex-wife filed a petition to set aside the divorce.
 
 Id,.
 
 She claimed that she and the deceased had reconciled and continued to cohabit as husband and wife.
 
 Id.
 
 After hearing testimony from the ex-wife, the chancery court granted the motion to vacate the divorce.
 
 Id.
 
 at 921. On appeal, the supreme court held that it was error for the chancery court to vacate the divorce upon the request of the surviving ex-spouse, and the supreme court reinstated the final decree of divorce.
 
 Id.
 
 at 924.
 

 ¶ 15. Whereas
 
 Wells
 
 involved an application for revocation filed after the ex-spouse’s death, the present case involves a situation in which both parties signed a joint application for divorce prior to the ex-spouse’s death. We find no cases on point that discuss a chancellor’s power to revoke a valid divorce, upon joint application by the parties, when one of the parties dies following the signing and filing of the application. The cases that are most analogous to the present situation are those cases in which a married couple files for divorce, and one of the parties dies before a valid divorce decree is entered.
 

 ¶ 16. In Mississippi, it is established that “the death of [the] complainant in the divorce action prior to the execution and entry of the final decree by the lower court ended the marriage of the parties and cancelled fully the bill of complaint for divorce and incidental property relief.”
 
 Pittman v. Pittman,
 
 375 So.2d 415, 416 (Miss.1979). In
 
 Pittman,
 
 the supreme court quoted 104 A.L.R. 654 as follows:
 

 It is well settled by practically all of the authorities that, upon the death of one of the parties to a purely divorce action,
 
 *1270
 
 before the entry of a final decree therein, whether before or after the entry of an interlocutory decree or a decree nisi, the action abates with the consequence that the action may not be continued and no final decree of divorce may be entered thereafter, since the object sought to be accomplished by the final decree, that is, the dissolution of the marriage relation, is already accomplished by the prior death of one of the parties, and there is then no status of marriage upon which the final decree of divorce may operate.
 

 Pittman,
 
 375 So.2d at 416. More recently, the supreme court ruled that the law, as set out in
 
 Pittman,
 
 regarding the death of one of the parties to a divorce action remains valid.
 
 Barton,
 
 790 So.2d at 173(1113).
 

 ¶ 17. Janet admits in her appellate brief that substitution of parties is not a proper remedy because she did not seek a revocation of the divorce with the intent of being married to anyone but Charles. The problem in this case is just that-substitution of another party in Charles’s place is not proper. The purpose of the joint application to revoke the divorce is to revoke the divorce — to reunite the two formerly married parties as a married couple. When one of the parties dies — as Charles did in this case — there can be no successful resolution of a petition to revoke a divorce. In
 
 Pittman,
 
 there was “no status of marriage upon which the final decree of divorce may operate.”
 
 Pittman,
 
 375 So.2d at 416. In the present case, there was no status of marriage to which a revocation of the divorce could have returned the parties.
 

 ¶ 18. Janet put on sufficient probative evidence of her reconciliation with Charles prior to his untimely death. However, because Charles died prior to any revocation decree or even a hearing, we do not find that the chancellor had the power to reinstate the marriage. As a matter of law, we find that the chancellor erred in conducting a hearing on the issue of the revocation of the divorce. Therefore, we reverse the judgment revoking Charles and Janet’s divorce, and we render judgment reinstating the final judgment of the divorce.
 

 ¶ 19. Finding the present issue to be dispositive of the case on appeal, we decline to address the remaining issues.
 

 ¶ 20. THE JUDGMENT OF THE CHANCERY COURT OF PEARL RIVER COUNTY IS REVERSED, AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.